Next argument is 20-1231 Ramos v. Banner Health. Mr. Sawyers, you may proceed. May it please the court, I'm Sean Sawyers representing the Plaintiff's Appellants. Plaintiff's argument in this appeal is based on a simple premise, that victims should receive full and fair compensation for their injuries, and wrongdoers should be held liable for the full extent of the harm they cause, not just a fraction of the harm. That didn't happen in this case. After an eight-day trial, the District Court found that the fiduciaries of the Banner Health 401k plan breached their duty of prudence with respect to the fees paid to the plan's record-keeper Fidelity. Banner failed to monitor the reasonableness of the record-keeping fees paid to Fidelity under an uncapped asset-based revenue-sharing agreement, which had no termination date, and failed for two decades to investigate market rates and the reasonableness of Fidelity's fees using any form of a competitive process. Had Banner acted prudently, it would have discovered that other similarly-situated plans had significantly lower per-perdicimate record-keeping fees and could have used the plan's leverage to negotiate lower fees without sacrificing the level or quality of services. Those findings are undisputed. So, the question is, what is a reasonable fee to measure the plan's damages caused by the breach? What is our standard of review on that issue? The standard, as far as the legal standard, that's reviewed de novo, and the courts... What does the District Court have to do? Pardon me? What does the District Court have to do? Does he have to take your position? The District Court doesn't have to take our position, but it has to apply the correct legal standard for measuring loss, and it has to explain the reasons for its findings, which didn't occur here. So, the proper measure of loss, the legal rule is comparing what the plan paid to what it would have paid under prudent management, and any uncertainty should be resolved against the breaching fiduciary and not against the participants. Well, here you put on a... The theory of your case was your presentation through your expert, and the court ultimately found the expert's methodology not credible. So, at that point, it has to select another methodology that was either apparent from the record or reconvene the hearing for additional proceedings, which that doesn't seem like the correct path since you didn't carry your burden on establishing a methodology. So, at that point, the District Court was entitled to go through Banner's presentation or any other position in the record to make a decision, and why didn't it do that adequately here? Well, the reason it didn't do it adequately was that the District Court didn't explain the reasons for the measure that it selected and why it found the revenue credits that it used to be the best measure of loss. The District Court acknowledged that there were multiple potential measures that it could look at, but it didn't identify what they were and why the revenue credits provided a better measure of the loss. So, didn't the District Court conclude that the method it selected was appropriate because it was, he said, it was based on plan characteristics, asset configuration, net cash flow, fund selection, and number of participants? Doesn't that give you a basis for understanding the calculation that he selected? Well, the revenue credits are based on those characteristics, yes, but that doesn't suggest that it measures the extent of the loss. The District Court found that lower fees could have been negotiated with diligent and prudent negotiation. So, that finding is inconsistent with them to find that what Fidelity voluntarily provided to the plan based on plan characteristics was the full extent of the damages. The range of fees that the methodology was unreliable or not credible, but there were other figures in the record that backed up what he said, multiple objective data points, and two of those are his client's plans A and B, but there were other measures as well. He did not use those as a basis of calculation. He used them as examples of his experience, and his experience is what he reached up to and pulled out his numbers. Isn't that correct? That's right. He relied on his experience, and that's what he based the fee range on, and those are the plans that he cited A and B are examples of that experience. So, he didn't look at these plans specifically when he's formulating the number, but they are part of the experience that he necessarily relied on in forming the opinion, and they do support the range that he suggested. He reached in and pulled out a number based on his experience. Does a judge have to take that and say, oh, your experience must be really great. Okay. Well, a judge doesn't have to rely on experience, but then the number that he provided was validated by other data points, and it's not just the two plans. It's another Banner-defined contribution plan with 700 participants paid $40 per participant. Who suggested that? That was a Banner witness, wasn't it? It was part of Banner's internal documents that the committee had meetings, and Slocum presented a report that showed Banner, the 403B plan is paying about $40 a head, while the 401k plan is paying double that amount, and there's a graphic on page 13 of our brief that's taken from that report that shows that. Did you raise that below that they should have used the other plan? We did. In the closing argument... Where did you use it in the evidence? Oh, there was a witness that was questioned about that document, and then in closing, sort of seeing the writing on the wall that there were doubts about the expert, we raised actually mid-trial as well during the argument on the defendant's Rule 52 motion that if the primary measure provided by the expert was rejected, that alternative measures should be considered, and that was one of the pieces of evidence that we pointed to. What is it that the district court should have done that would keep it from having erred in your view? You're not saying it had to buy Mr. Schmidt's numbers lock, stock, and barrel. Where is the point of error? Well, assuming Schmidt is rejected, at a minimum, the court had to discuss what other damages measures it looked at and why it found the revenue credits that are used to be the superior method of loss. So, aside from what Banner's DC plan, the 403B plan paid, the consultant, Slocum, provided reports on what other plans were paying, and that's a chart that's at page 14 of our brief, and the district court relied on that evidence and its liability findings to find... That was the only reason it was presented, to show liability, not in terms of damage calculations. Well, we relied primarily on Schmidt to prove damages, that's right, but then it was also advanced as an alternative if the court were to reject Schmidt. So, there was no explanation by the district court why, if that evidence was sufficient to show that similarly situated plans were paying significantly lower purported fees, and that the plans suffered a loss as a result, and that the fiduciaries could have used that information to negotiate lower fees without sacrificing quality or service level, and that is what the district court found at 158 and 177, those paragraphs of the order. Why was that not a sufficient measure to determine the amount of the plan's losses? There was no explanation for that. So, at a minimum, the district court should have analyzed that and determined, considered it, whether that provided an accurate damages measure. And then there's what the plan actually got in 2017. Once the fiduciary switched from the asset-based model to a per-participant model, the plan paid $42, again, right in line with the range that Schmidt proposed. And as an example of an analysis of alternatives, in dismissing count two, which has not been appealed, which dealt with certain investment options in the plan, the district court did discuss different potential measures of damages and found that none of them caused a loss, whereas here it only discussed the revenue credits. You didn't appeal that? We did not appeal that, and that was an adequate explanation in contrast to what was done on the record-keeping fees. What's wrong with the district court selecting the IRS underpayment measure? It doesn't make the plan whole. Neither party proposed that. The parties recognized that at a minimum, it should be something that has to do with the plan, either the S&P 500 return, which the plaintiffs presented, or the plan's return, the plan as a whole, which the defendants expert presented. And again, there was no explanation of how that was an adequate measure to restore the plan, to make the plan whole. Well, did you ever raise the use of the plan rate of return to calculate pre-judgment interest? We did. It was raised in... I thought you only relied on the S&P 500 index. Oh, we didn't, but the defendants suggested the plan return. Okay. And then, well, I'll reserve... Actually, one other point I wanted to get to quickly, the prohibited transaction claim, the district court, that should also be reversed. The district court... Well, that's not making sense, counsel. What you're saying is that if you hire somebody to do a service, and you pay them a fee for that service, that then they're in a compromised position, and so you shouldn't have paid them for the service. But that's not what the statute says. It begins section 406A, and it's in an appendix on page 61 of our brief, except as provided in section 1108 of this title, which contains the exemptions. So what it's saying is it's prohibiting paying someone unless the plan complies with the exemption, meaning paying unreasonable compensation. So paying someone for a service, if it's reasonable, that's not prohibited. That was where the district court erred in interpreting section 406 that way. I thought you argued fidelity was a party in interest because it provided record keeping and administrative services, and that made the payment of fees a prohibited transaction. Well, it was paying excessive fees, and that's what we alleged was a prohibited transaction, and fidelity was in that position for 20 years. So to say it wasn't a party in interest in 1999 at the time of the initial contract doesn't control the subsequent contracts and what happened during the class period. It was clearly a party in interest by then. Go ahead. That's all I have. Those sound to me like breach of fiduciary duty arguments, not prohibited transaction arguments. Well, the statute 1108 specifically refers to service provider compensation, and the fiduciary duty statute doesn't talk about compensation at all. So there's a stronger argument that 406 and 408 apply to service providers more so than 404, and I'll preserve the balance of my time. Let's suppose that a director of the hospital also had a record keeping operation, and he was hired. Would that make it a different situation? Well, he would be an insider. He would also be a party in interest, but I don't see. If he was paid a reasonable amount of fees for his services, then that potentially wouldn't be a prohibited transaction. And who determines what's reasonable under those circumstances? You? Well, we proved it was not reasonable, and the district court found it in its findings that the had no correlation to the amount of revenue sharing received, so we proved that it was unreasonable. But that's not Fidelity's fault. They negotiated whatever they negotiated. That's correct. We're not seeking to hold Fidelity liable, though. The fiduciary has the responsibility to make it reasonable. Thank you. All right, counsel, let's hear from Mr. Kimberley. Thank you, Your Honor. May it please the court. My name is Michael Kimberley, and I am here representing the defendants' appellees. Your Honors, the district court can't be faulted for declining to award damages according to theories that were not advanced before it by the plaintiffs, particularly when those theories are based on evidence the plaintiffs themselves disavowed as irrelevant and unreliable before the district judge. The fact is the judge sat through an eight-day bench trial, and he got to know the witnesses and the record better than anybody. Based on that in-person evaluation, he came to reasonable conclusions about who and what was believable and who and what was not. Concerning damages, the court concluded that plaintiff's expert, Martin Schmidt, was not credible, and that conclusion is entitled to substantial deference on appeal. For a law's calculation, the judge was therefore left to his own devices, and he did the best that he could in light of the record that was before him, and relying on the revenue credit account was within the range of reasonable options that he had to measure damages in this case. Why was that better than, as Mr. Sawyer says, the 2017 figure of $42? That seems pretty good. Well, Your Honor, the plan itself changed significantly across the class period, and really what we're talking about is a delta of almost twofold from 2009 to 2017, and the evidence is clear throughout the record that a determination of what is a reasonable fee has to turn on the unique circumstances of the plan at the time, and the fact is the plan earlier in the class period was a very different plan than it was later on in 2017. I'd add that the fact that a fee could be obtained doesn't mean that it had to be obtained. What the evidence also shows, Your Honor, is that the record-keeping services that are purchased in this sort of market vary significantly, and, for example, in this case, Fidelity had representatives on site virtually every working day of the year. The evidence is that the plan participants valued brick-and-mortar access to Fidelity storefronts, and so this is not a one-size-fits-all sort of scenario, and these distinctions both between the plan and the services are important to evaluating what a reasonable fee is. Candidly, Your Honor, and more fundamentally, that argument just wasn't made to the district judge. Plaintiffs came forward with a single theory of measuring the loss to the plan, and it was Mr. Schmidt's analysis based on his experience. They then argued, as Mr. Sawyers noted, that if the district judge rejected that particular theory, their view was that the judge had to come up with his own measure, and he did that, and they did not, however, as a part of that fee review or rely on the 403B fees or rely on the 2017 forward fees. They just said in a vague and general way, look, if you don't like Schmidt, you've got to come up with your own, and that's exactly what the judge did, and now having persuaded the judge to do that work for them, they're complaining on appeal by raising arguments that they never presented to the judge and didn't give the judge an opportunity to weigh in the first instance. It's a classic example of a waiver of an argument, which applies here just as it does in any other circumstance. Why do you think the explanation the judge gave the revenue model was adequate? Well, there are a handful of reasons to think that it was adequate, and before I get to those, I'll link back to the argument in the prior case and what Mr. Jackson was saying about Rule 52A. Of course, any argument about the insufficiency of the explanation is not actually an argument that relying on the revenue credit account is improper. It's just to say that the judge didn't offer sufficient explanation, but of course the judge has no obligation to explain why theories of damages that were never presented to him were inadequate. So why was the RCA adequate? And it's a two-step analysis. The first is throughout the district judge's opinion, he made clear that although he said at one point the record-keeping services are somewhat fungible. In fact, I think everything he says throughout the remainder of the opinion is quite clear that these services are really plan-specific. This comes in paragraph 191, where he says the level and scope of services vary depending on the circumstances of both the plan and the provider. At paragraph 183, the judge notes that Schmidt himself testified that one cannot and should not rely on data concerning other plans to assess what is a reasonable fee for another particular plan. At paragraph 139, the judge says that Banner has a large plan requiring, quote, sophisticated record-keeping services that were tailored to, quote, unique characteristics and needs of the plan. And at paragraph 186, the judge recognized that the service and quality of the record-keeping and administrative services provided by Fidelity to the plan were uniquely tailored to the Banner plan. That makes looking at other comparators not especially useful, and it leaves the judge with the question then, what is the most accurate way of determining what a Banner plan-specific measure of damages is? And that answer is the revenue credit account, because, of course, the revenue credit account was tailored to that situation. It was the account that Banner itself received. And so, on this point, it bears mention that there are really two kinds of fees, as Mr. Soares said. There's the flat rate fee, and there's a revenue-sharing fee. Revenue-sharing fees are often capped. When they are capped, the record-keeper will take the revenue, but it will then create a revenue credit account, just as it did here. That revenue credit account is then used by the plan to debit for plan expenses, again, just like the revenue credit account here. So, in February of 2012, when the parties established the revenue credit account, it was effectively converting to something like a capped revenue-sharing model. And that is what the district judge, in effect, said would have been reasonable under the circumstances, had there not been the breach that he found with respect to monitoring the record-keeping fees. So, it means, as long as Banner was receiving the revenue credit, there were no damages. And for those years prior to receiving the revenue credit, there were damages, and he simply extrapolated. It was roughly about $20 per person, by my back of the envelope analysis. But that was... How can we be confident that the revenue-sharing model was the most advantageous model for the plan? Well, Your Honor, respectfully, I don't think that's the question that this Court on Appeal should be asking. My friend on the other side makes the argument that the judge was duty-bound to find the very most generous measure of damages. In fact, the cases that he cites for that proposition, starting with the Second Circuit's decision in Beerworth, stand for the proposition that when there is a lack of clarity or there are multiple plausible ways of measuring damages that have been presented to the judge, argued by the parties, supported by evidence, the judge, in determining which among the options to select, should select the one that most favors the beneficiaries. And if, in turn, the fiduciaries have reasons to argue that less generous measures are more appropriate, the burden is on them to prove it. Here, this is not a case where the parties were fighting over what is the most relevant or appropriate model. There was just one theory put forward by the plaintiffs, and that theory was rejected not because it was too fuzzy, but because it was completely incredible and unreliable. So the judge was put in a position where he really had nothing to go on, having rejected Schmitt's opinion on what the loss calculation was, and was therefore put in a position of having to determine, based on his own understanding, intimate understanding, reflected in a 136-page opinion, of what the record indicated was the most appropriate, or really, I should step back, inappropriate measure of damages. And so I have to reject, Your Honor, respectfully, the notion that it was on the judge to sift through the evidence and come up with potentially more generous methods of adopt those alternative measures, because those measures were never argued to him, and it was not his obligation as the judge to do that work. I would mention also, Judge Kelley, you started out with a question about standard of review. My friend on the other side says that the question of how to measure the loss is a legal question, reviewed de novo, but then he described the measure of the loss as what Banner would have paid without the breach. That is exactly the question that the district court answered. So the question of what the standard is is not really the issue before a court. It is instead the factual issue, based on the record. What is, in fact, the answer to that question? And that is a fact question, reviewed by this court for clear error. And with respect to my friend on the other side, nothing in his briefing comes close to showing that this court ought to reject the district judge's determination of what an appropriate loss measure is as a matter of clear error. If I may, I'll say a brief word about the prejudgment interest. This is subject to discretion. So really the only question is whether the IRS rate is a permissible rate. Judge Kelley, as you noted, Mr. Schmidt testified, pardon me, at appendix page 608, that it would be inappropriate and, quote, didn't make sense to use the actual rate of return as the measure of prejudgment interest. In addition, in fact, there's nothing in the record providing that sort of fulsome weighted analysis of what the rate of return was. So here again, the district judge is presented with the S&P 500. He rejects that as an appropriate measure because there were funds in the plan that were not correlated with the S&P 500. He has an expert telling him you can't rely on the actual fund performance, and he's again left to his own devices. I would point the court to the Russo case, a 1994 case out of the Southern District of New York, where the judge there also was left to conjecture as to whether or not the rate of return was an appropriate measure and adopted the IRS rate, and that we think is the appropriate way of approaching this issue, particularly, again, given the abusive discretion standard of review. How about something like the Colorado statutory rate or something like that? Wasn't that in the record? Your Honor, yes, and that was on the menu of available options to the judge. Again, the abuse of discretion standard, there would have to be a reason for the judge to conclude that it is affirmatively inappropriate, that it is outside the range of permissible choices that were available to him to reverse on the selection of the IRS rate. Is it conceivable that the judge in exercising his discretion could have adopted the Colorado statutory rate instead? Yes, but that isn't to say that it was a reversible abuse of discretion not to adopt it. Don't the cases suggest that he has to select a rate that would be most advantageous to the plan or at least would make it hold? Well, here again, Your Honor, the answer to that is only to the extent that the issue was actually argued and supported to the judge. Again, the theory that was put before the judge was the S&P 500. The judge concluded at paragraphs 96 to 97 that that wasn't appropriate. So here again, without guidance from the plaintiffs about what a reasonable alternative is, he landed, as other courts routinely do, on the IRS rate. And we think that rate indeed is set by Congress exactly for the purpose of measuring the time value of money. So it's, we think, appropriate to explain why he rejected the other plausible rates. I would say, Your Honor, again, because it just wasn't raised to him. Judges under Rule 52a do not have an obligation to suss out all the potential arguments that could have been made in favor of alternatives that were not actually presented. If plaintiffs had argued these alternative theories, that would be a different story. But not having done so, Rule 52a doesn't require that sort of analysis. I see I have about 30 seconds left. I'm happy to say something about prohibited transactions if the court has questions. Otherwise, we'll rest on our papers. Thank you, Your Honor. All right. Let's see. Did you? I think Mr. Sears did not have any rebuttal time. I think we understand the arguments. We appreciate your presentations this morning. The court, counsel are excused and the case will be submitted.